J. G. Stoller and Geraldine Stoller v. Commissioner.
J. G. Stoller & Geraldine Stoller v. Commissioner
Docket No. 37343.
United States Tax Court
1953 Tax Ct. Memo LEXIS 112; 12 T.C.M. (CCH) 1061; T.C.M. (RIA) 53313; September 18, 1953
Richard R. Hollington, Esq., for the petitioners. Michael J. Clare, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined a deficiency of $5,344.42 in the petitioners' income tax for the year 1947. The only issue for decision is whether respondent erred in disallowing a farm loss claimed by the petitioners for the year 1947. The respondent's "Explanation of Adjustments" in the deficiency notice was as follows: "(a) In Schedule E, page 2 of your 1947 income tax return, you claimed a farm loss of $10,536.85. It is held that the loss claimed is not allowable under the provisions of Section 23 (e) of the Internal Revenue Code." Findings of Fact Part of the facts were stipulated *113 and are incorporated herein by this reference. Other facts are found from oral evidence. The petitioners are husband and wife, residing at 659 Palisades Drive, Akron, Ohio. They filed a joint income tax return for the calendar year 1947 with the collector of internal revenue for the 18th district of Ohio. In 1937 petitioners purchased at a foreclosure sale a farm located in Richfield Township, Summit County, Ohio, approximately 5 miles north of Akron. The farm consisted of 84 acres with a house, barn and miscellaneous farm buildings. The purchase price was $6,300. Prior to making the purchase the petitioner, J. G. Stoller, sometimes hereinafter referred to as the petitioner, went over the entire farm with his brother, Hugh Stoller, and they discussed its various features and possibilities. Petitioner and his brother were born and had lived on a farm for 20 years and had participated in all phases of general farming. Since 1933 petitioner has been employed as a representative of Cannon Mills. Prior to 1933 he was secretary of General Tire and Rubber Company. The prior owner of the farm had allowed it to deteriorate. The land had not been worked for a considerable period, the *114 buildings, particularly the barn, were in poor shape and the fences needed repair. After petitioners purchased the farm, they replaced the barn at a cost of $15,183.12 and repaired the fences. The farm had been operated as a dairy farm and petitioners continued this type of farming. In 1938 and 1939 they operated on a share-crop basis. This proved unsatisfactory and in 1940 they hired a tenant to manage and operate the farm. The tenant farmer continued in petitioners' employ until the fall of 1946. In February 1946, petitioners purchased for $5,000 an additional tract of 74 acres directly across the road from their original purchase. There were no buildings on the 74-acre tract. This land was also run down, but, since it was so handily located, it could be worked without additional equipment and with little added expense. During the period 1938-1946 petitioners made extensive efforts to build up the first farm. They have increased and now maintain a herd of 30 to 40 head of dairy cattle. They purchased necessary farming equipment and spent yearly sums for the repair and maintenance of machinery, equipment and buildings. They consulted the county agent with respect to ways and means *115 of improving the farm. In 1946 they became dissatisfied with their tenant farmer and advertised in the newspapers in the area for a new tenant farmer. After interviewing several applicants petitioners hired Robert Mohn, sometimes hereinafter referred to as Mohn, to manage the farm. He was paid a salary of $150 per month plus living accommodations. Mohn had worked on farms for over six years doing general farm work. Petitioner and Mohn discussed plans for the long range improvement of the farm and to that end consulted Robert Yoder, Chief Agronomist of the Ohio Experiment Station, and Earl P. Carlton, the local county soil conservationist. These men inspected the farm and drew up a complete plan for its development. The plan included a cropping plan, an outline of conservation operations, an outline of livestock and feed requirements, pasture requirements and anticipated crop production. As a result of these plans petitioners have spent yearly sums in liming and fertilizing the fields and have planted a considerable number of trees on land not suitable for cultivation to check land erosion. Petitioners also installed a large amount of tile in 1947 to improve the drainage of the land. *116 The following amounts were expended for fertilizer and lime for the years 1938-1947, inclusive: 1938
$702.68
1939
383.25
1940
226.35
1941
618.27
1942
463.13
1943
165.34
1944
189.98
1945
258.10
1946
392.36
1947
667.65
In December 1947, petitioners purchased an additional parcel of land consisting of 15 acres for $8,000. This acreage adjoined the land purchased the previous year and provided an outlet for the drain tile. Since purchasing the farm, petitioners have made improvements thereon. A schedule showing the kind of improvements, the year made and the amount expended is as follows: Capital
Year
Improvements
Acquired
Cost
Barn
1938
$15,183.12
Hog pen
1939
516.09
Ventilator
1940
312.62
Sheds
1942
626.99
Fence
1938
269.56
1939
391.49
1940
394.67
1946
74.16
Tile
1947
2,526.41
1948
1,516.02
Calf shed
1950
5,101.93
As shown by the above schedule, from the time of purchase of the first farm in 1937 through the taxable year 1947 the petitioners expended $20,295.11, which was charged by them to capital improvements. Since 1947 petitioners have expended $6,617.95. The following farm equipment *117 was purchased by petitioners during the indicated years and at the stated cost and were used in the operation of the farm: Year
Item
Year
Farm equipment
acquired
cost
total
Spreader
1938
$ 25.00
Wagon
1938
45.00
$ 70.00
Water heater
1939
122.75
Equipment
1939
11.76
Plow
1939
105.25
Disc
1939
97.15
Saw
1939
39.55
376.46
Grain drill
1940
162.00
Strainer
1940
31.41
Spreader
1940
235.00
Cart
1940
13.31
Freight
1940
1.11
Binder
1940
135.00
Clipmaster
1940
20.15
597.98
Corn sheller
1941
14.85
Ventilator
1941
110.00
Tools
1941
38.44
Cultivator
1941
4.50
Weeder
1941
39.90
Scale
1941
19.21
Rake
1941
123.75
Cultivator
1941
112.50
Wagon
1941
72.00
Corn
binder 244.30
1941
Lime
spreader 92.80
1941
337.10
872.25
Hammer mill
1942
125.25
Trailer
1942
48.16
Equipment
1942
128.39
Hog feeder
1942
30.00
331.80
Ensilage cutter
1943
335.00
Lard cutter
1943
18.00
Used brooder
1943
25.00
378.00
1944
0.00
Farm scales
1945
15.00
Farm scales
1945
9.68
Farm tool grinder
1945
18.50
Farm power saw
1945
40.08
83.26
Power mower
1946
121.03
121.03
Corn picker
1947
820.00
Farm heater
1947
50.85
Fire extingquisher
1947
50.00
Sewer pipe
1947
100.27
1,021.12
Spring tooth
harrow
1948
115.00
115.00
1 Baler
1949
1,220.55
1 Combine
1949
1,500.00
2,720.55
1 Baler
1950
1,242.85
Pig pen guards
1950
34.25
1,277.10
6 Water bowls
1951
48.20
1 18inch Disc
1951
210.00
1 Manure spreader
1951
296.00
554.20
$8,518.75
Tractor
1939
$ 889.60
$ 889.60
Tractor
1949
1,353.00
1,353.00
*118 The petitioner has been active in the supervision and operation of the farm since its purchase. He has never lived on the farm but spends week-ends there, and frequently during the week goes to the farm to discuss its operation with Mohn. He also helps with the farm work during harvest. On some occasion his brother helps with the farm work. Also, he occasionally hires other people as temporary farm laborers. Usually petitioner pays for the extra labor but is not reimbursed from the farm account. There are no recreational facilities of any kind on the farm, and petitioners have never used the farm for picnic parties or social gatherings. An 8-room house which has always been occupied by the share-croppers or the tenant farmer and his family is located on the premises. The petitioners have no room set aside for their use and have stayed at the farmhouse upon one occasion only since its purchase. One horse is kept on the farm which is used for farm purposes and not for petitioners' recreation. Petitioners obtain virtually no produce from the farm. Petitioners maintain a small bank account to defray all minor farm purchases. These purchases are made by Mohn, who makes a monthly accounting *119 to petitioners. The monthly reports are incorporated in a two-column farm journal kept by petitioners. Receipts from sales of milk and livestock are also entered in the journal. Petitioners have increased their chicken and egg business which has been productive, and plan to raise beef cattle which will require less labor than the dairy herd. All of these activities were entered into by petitioners with the expectation of realizing a profit. During the taxable years 1938-1951, inclusive, the petitioners' Federal income tax returns disclosed income, expenses and losses from the operation of the farm in the following amounts: Year
Income
Expenses
Losses
1/2
1938 *
$ 598.08
$ 2,598.93
$ 2,008.85
$1,004.43
1939 *
1,373.82
2,867.38
1,493.56
746.78
1940
944.32
4,824.28
3,879.96
1941
2,036.37
5,274.35
3,237.98
1942
2,303.99
6,008.35
3,704.36
1943
3,070.49
5,779.97
2,709.48
1944
2,218.15
5,168.48
2,950.33
1945
3,490.15
6,551.71
3,061.56
1946
1,932.38
9,152.94
7,220.56
1947
4,417.65
14,954.50
10,536.85
1948
4,591.88
12,358.47
7,766.59
1949
4,401.56
12,263.72
7,862.16
1950
5,736.03
12,431.41
6,695.38
1951
7,269.67
11,021.73
3,752.06
*120 The 1947 loss was due partially to the extremely wet spring weather which prevented the planting of corn until late in the year and from the failure of the previous tenant to put in sufficient feed crops in 1946 to take care of the livestock in 1947. This increased the feed bill in 1947 to $3,267.63, whereas in prior years it had not exceeded $1,100. Petitioners have also been forced to pay high wages because of the high labor cost in the Akron-Cleveland industrial area. The price of milk has been low in this area as compared with other sections because of a price-cutting milk dealer located in Akron. These factors caused petitioners in 1952 to dispose of the dairy herd and to begin raising beef cattle. During the taxable year 1947 petitioners spent $1,669.54 to coat the roofs of all buildings on the farm with liquid asbestos. The roof coating was guaranteed by the manufacturer for 10 years. Petitioners also paid $5,211.65 for farm labor in 1947. Of this amount, $1,000 was a capital expenditure. Petitioners operated the farm as a business in the pursuit of profit during the taxable year 1947. Opinion The only question *121 for decision is whether petitioner carried on a farm operation for the purpose of making a profit. Regulations 111, Section 29.23(e)-5, [1] governs the deduction of farm losses. Ultimate decision rests upon the intent of the taxpayer, which intent must be determined from the particular facts of each case. Norton L. Smith, 9 T.C. 1150. Respondent contends that petitioner had no intent to operate the farm as a business enterprise for the purpose of making a profit during the taxable year 1947. In support of this contention respondent relies upon the following conclusions which he argues must be accepted as proven fact: (1) Petitioner's primary and major interest was that of a cotton broker, (2) all *122 efforts were directed to building up the soil and developing a country estate rather than increasing dairy production, (3) that the operation of the farm resulted in continuous losses, and (4) the farm was used to furnish farm products for petitioner and his tenant. The record supports respondent's contention that petitioners have suffered continual losses on the farm from the time it was purchased in 1937 through 1951, but that fact alone is not determinative of the issue. If it be shown that petitioners' purpose in owning and operating their farm was to realize an eventual profit therefrom their losses are deductible. Norton L. Smith, supra; Israel O. Blake, 38 B.T.A. 1457; Hamilton F. Kean, 10 B.T.A. 97. The petitioners have endeavored to make the farm a profitable enterprise by spending yearly sums for lime and fertilizer to reclaim the soil, by consulting the county agent and the agronomist to determine the best use to make of the land, by changing from share farming to a farm manager when they realized the share farmer could or would not carry out their plans for improvement, by purchasing new land to increase pasturage and crop production *123 which would cut down the amount of feed needed to be purchased for the dairy herd, and by changing to other types of farming, i.e., poultry and beef cattle, when it became apparent that dairy farming was not going to be profitable. A consideration of the record convinces us that petitioners' intention at all times has been to operate the farm at a profit. We can not agree with respondent that petitioners' plan was to build a country estate. It was necessary for petitioners to reclaim the soil with lime and fertilizer in order to produce feed for cattle. The record does not disclose any expenditures by the petitioners to erect an expensive home or beautify the farm. While it is true petitioner enjoyed working on the farm, this does not negate an intent to operate the farm for profit. As stated in Wilson v. Eisner, 282 Fed. 38: "Success in business is largely obtained by pleasurable interest therein." The fact that petitioner had another occupation is of no significance, as Regulations 111, Section 29.23(e)-5, contemplates that a farm may be operated as an additional business of the taxpayer. In regard to respondent's contention that the farm was used to furnish food *124 for petitioners and the farmer, the record indicates that the amount of food obtained from the farm by the petitioners was very small and the cost of raising such food was more than offset by the labor petitioners brought to the farm and paid for out of pocket, but which was never deducted from their tax return. The food used by the tenant was mostly from a garden cultivated by him for his own use and was not part of the major production of the farm. Norton L. Smith, supra. Respondent contends in the alternative that if we find the farm was operated as a business, then some of the expense items are not ordinary and necessary expenses of operation of the farm but were capital in nature or were personal expenses. In this connection, respondent states that the cost of feeding the horse and the payment of utility bills on the farm were personal expenses. We can not agree. The record discloses no use to which the horse was put other than farm use. The feed costs for the horse are clearly deductible as a necessary business expense. The utilities furnished the tenant farmer were part of the cost of having him on the farm and accordingly were a necessary expense. Respondent *125 further contends that the amount expended for covering the leaks in the roof should be capitalized. New roofs had been put on the farm buildings when petitioners purchased the farm in 1937. They began to leak because of expansion and contraction caused by the weather. The application of the liquid asbestos roofing did not prolong the life of the roofs but simply maintained the roofs in an ordinarily efficient condition. This was a maintenance cost and is deductible as an ordinary and necessary business expense. See Pierce Estates, Inc., 16 T.C. 1020; reversed on another issue, 195 Fed. (2d) 475. Lastly, respondent contends that part of the labor cost for 1947 was expended for erecting fences, planting trees, laying tile and clearing fields, and should be capitalized as was the cost of the materials. The record does not disclose that any fences were erected in 1947, and we assume that the cost of the drain tile, which was stipulated, included the labor to install it. However, the planting of trees to prevent soil erosion and the clearing of fields were capital expenditures. See Thompson & Folger Co., 17 T.C. 722. We have, therefore, found as *126 a fact that $1,000 of the labor cost for 1947 represented capital expenditures. Cohan v. Commissioner, 39 Fed. (2d) 540. Decision will be entered under Rule 50. Footnotes
*. 1938 and 1939 farm operated on share-crop basis.↩
1. Sec. 29.23(e)-5. Losses of Farmers. - Losses incurred in the operation of farms as business enterprises are deductible from gross income. * * * If an individual owns and operates a farm, in addition to being engaged in another trade, business, or calling, and sustains a loss from such operation of the farm, then the amount of loss sustained may be deducted from gross income received from all sources, provided the farm is not operated for recreation or pleasure. * * *↩